1 | Robert J. Lauson, Bar No. 175,486
   bob@lauson.com
2 | Edward C. Schewe, Bar No. 143,554
   ed@lauson.com
3 | LAUSON & SCHEWE LLP
1600 Rosecrans Avenue, 4th Floor
4 | Manhattan Beach, CA 90266
Tel. (310) 321-7890
5 | Fax (310) 321-7891

6 | Attorneys for Plaintiff/Counterclaim
Defendant,
7 | BRIESE USA, INC.

8

9

10 | **UNITED STATES DISTRICT COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA**

12

13 | BRIESE USA, INC.,

14 |                              Plaintiff,

15 | v.

16

17 | BRIESE LICHTTECHNIK
VERTRIEBS GmbH, *et al.,*

18

19 |                            Defendants,

20

21

22 | and consolidated actions.

CASE NO.:   CV 07-2735 GHK (CWx)

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

**Date:**    **None**
**Time:**    **None**
**Place:**   **Courtroom 650**
**Judge:**   **Honorable George H. King**

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     THE AGREEMENT BETWEEN THE PARTIES . . . . . . . . . . . . . .   2

        A.      The testimony of Ms. McIlroy   . . . . . . . . . . . . . . . . . . . . . . .   2

        B.      The testimony of Mr. Langton   . . . . . . . . . . . . . . . . . . . .   5

        C.      The testimony of Mr. Ortiz   . . . . . . . . . . . . . . . . . . . .   6

III.    APPLICABLE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . .   6

IV.     PLAINTIFF OWNS THE BRIESE MARK IN THE U.S. . . . . . . .   7

V.      PLAINTIFF ESTABLISHED SECONDARY MEANING . . . . . . .   11

VI.     DEFENDANT BRIESE GMBH FAILED TO
        ESTABLISH SECONDARY MEANING AS REQUIRED . . . . . . .   14

VII.    PLAINTIFF HAS ESTABLISHED A
        LIKELIHOOD OF CONFUSION . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

VIII.   ANALYSIS OF THE DIFFERENT TYPES
        OF CONDUCT AT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

IX.     A TRADITIONAL TRADEMARK PRIORITY
        ANALYSIS IS NOT APPLICABLE IN A
        MANUFACTURER DISTRIBUTOR RELATIONSHIP . . . . . . . .   20

i

X.   THE MERGER RULE IS INAPPLICABLE AND
     UNNECESSARY TO THE PRESENT CASE . . . . . . . . . . . . . . . .   21

XI.  PLAINTIFF HAS DEMONSTRATED
     IRREPARABLE HARM AND ANY
     DELAY SHOULD BE ATTRIBUTED TO
     DEFENDANT'S MISLEADING ASSERTIONS
     THAT DEFENDANT HW BRIESE'S HEALTH
     DID NTO ALLOW HIM TO TRAVEL BY AIR
     IN 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
     A. The Misleading Assertions by
        Defendants of "Doctor's Orders" . . . . . . . . . . . . . . . . . . . . . . .   23

XII.  THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF . . . . . .   24

XIII. THE PUBLIC INTEREST FAVORS PLAINTIFF . . . . . . . . . . . .   24

XIV.  BOND REQUIREMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

XV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3  *AMF v. Sleekcraft Boats,*

4  599 F.2d 341 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

5

6  *Carter-Wallace, Inc. v. Proctor & Gamble Co.,*

7  434 F.2d 794 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

8

9  *Caterpillar, Inc. v. Jerryco Footwear,*

10  880 F.Supp. 578 (CD Ill 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

11

12  *Chalk v. U.S. Dist Ct.,*

13  840 F.2d 701 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

14

15  *Committee for Idaho's High Desert v. Yost,*

16  92 F.3d 814 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

17

18  *Family Record Plan, Inc. v. Mitchell,*

19  172 Cal.App.2d 235, 342 P.2d 10 (2d Dist. 1959) . . . . . . . . . . . . . . .   20

20

21  *GoTo.Com v. Walt Disney Co.,*

22  202 F.3d 1199 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

23

24  *Liebowitz v. Elsevier Science Ltd.,*

25  927 F. Supp. 688 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

26

27  *Levi Strauss & Co. v. Blue Bell, Inc.,*

28  778 F.2d 1352 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Miller v. Glenn Miller Productions, Inc.,*
454 F.3d 975 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

*Omega Nutrition USA v. Spectrum Marketing,*
756 F.Supp. 435 (ND Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . .    7, 8, 21

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.,*
475 F.Supp.2d 995 (CD Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . .    6, 22, 23

*Rent-A-Center, Inc. v. Canyon Television*
*& Appliance Rental, Inc.,*
944 F.2d 597 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*R.G. Group, Inc. v. The Horn & Hardart Co.,*
751 F.2d 69 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

*Sebastian Int'l v. Longs Drug Stores Corp.,*
53 F.3d 1073 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

*Sengoku Works Ltd. v. RMC International, Ltd.,*
96 F.3d 1217 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

*Tactica International, Inc. v. Atlantic Horizon Int'l,*
154 F.Supp.2d 586 (SDNY 2001) . . . . . . . . . . . . . . . . . . . . . . . .    8

*Vision Sports, Inc. v. Melville Corporation,*
888 F.2d 609 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Wisdom Import Sales Co., LLC v. LaBatt Brewing Co., Ltd.,*
339 F.3d 101 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

*WMX Techs v. Miller,*
80 F.3d 1315 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23


## **Other Authorities**


Fed.R.Civ.P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

2 McCarthy, *McCarthy on Trademarks* § 16:34 . . . . . . . . . . . . . . . . . . . .    14, 20, 22

4 McCarthy, *McCarthy on Trademarks* § 25:32 . . . . . . . . . . . . . . . . . . .    21

4 McCarthy, *McCarthy on Trademarks* § 25:41 . . . . . . . . . . . . . . . . . . .    19

Chestek, *Who Owns The Mark? A Single Framework*
*For Resolving Trademark Ownership Disputes,*
96 Trademark Reporter 681, 697 (May 2006 - June 2006) . . . . . . . . . . . . .    20, 21

## I.   INTRODUCTION

Plaintiff Briese USA, Inc. moves for an order to preliminarily enjoin use of the Briese and Briese USA marks by Defendants as set forth in the accompanying proposed preliminary injunction.  The facts in this case as developed at the recent depositions show that Briese USA has exclusive rights to rent, sell and to represent and promote the Briese name in the U.S.  Further, Briese USA has established a likelihood of success on the merits, irreparable harm and that the balance of hardships tip in Briese USA's favor.

Moreover, as explained in Section XI herein, depositions revealed that Defendant Mr. Briese's purported inability to travel by air in 2007 was misleading at best.  In fact, Mr. Briese obtained a permission letter from Dr. Kuck to travel by air back in July 2007.  This is the same Dr. Kuck whose letter was the basis for arguing Mr. Briese should not travel by air due to alleged health issues.  This lack of candor by Defendants has delayed this action for months while Mr. Briese purportedly was recuperating.  Such delay has further damaged and irreparably injured Plaintiff's customer good and reputation and is a further reason the requested preliminary injunction should be granted.

The supporting transcripts of the depositions are attached to the accompanying declaration of Edward C. Schewe as McIlroy Depo (Ex. 1), nonconfidential Langton Depo (Ex. 2), Ortiz Depo (Ex. 3), Belkin Depo (Ex. 4), Devlin Depo (Ex. 5), Malykont Depo (Ex. 6) and HW Briese Depo (Ex. 7) with additional Exhibits 8 and 9 referenced herein.  The confidential portions of the deposition transcripts are separately filed under seal in a second Schewe declaration as confidential Langton Depo with deposition Exhs. 114-117 (Ex. 10) and J. Briese Depo (Ex. 11).   Pursuant to the Court's February 5, 2008 Order, Plaintiff also concurrently submits true and correct copies of videos of the deposition transcripts.

## II.   THE AGREEMENT BETWEEN THE PARTIES

The testimony of Ms. Lee Anne McIlroy, Mr. Brent Langton and Mr. Sergio Ortiz demonstrates that the parties did reach an enforceable verbal agreement with Mr. Hans Werner Briese whereby Briese USA would have exclusive rights in the U.S.

**A.**   **The testimony of Ms. McIlroy.**   Ms. McIlroy was the Vice President of Briese USA, Inc. and has personal knowledge of the agreement reached between the parties in New York in the Fall of 1998 or 1999.  Ms. McIlroy was very much involved at the beginning of all of the negotiations of the rental and purchase and the establishment of Briese USA starting in the late '90s, 1998, fall of 1998 and 1999. McIlroy Depo at 8:12-23, Ex. 1.  Ms. McIlroy was previously married to Mr. Brent Langton. McIlroy Depo at 8:5-7.

Ms. McIlroy's testimony is that Mr. Langton and Ms. McIlroy were scheduled to meet with Mr. and Mrs. Briese at a photo exposition in New York City in the Fall of 1998 or 1999.  Prior to that meeting, Ms. McIlroy and Mr. Langton had begun purchasing Briese lighting equipment to rent in the United States. McIlroy Depo at 11:3-11.

Ms. McIlroy and Mr. Langton in fact purchased Briese lighting equipment taking out bank loans based on emails and faxes sent back and forth between Briese GmbH and Ms. McIlroy and Mr. Langton in California.  McIlroy Depo at 12:23-13:2; McIlroy Depo at 16:10-15; McIlroy Depo at 17:17-25.   Ms. McIlroy and Mr. Langton had leveraged a lot of money to purchase the equipment and they had no need to purchase the equipment other than to establish Briese USA.  McIlroy Depo at 17:7-10.

Ms. McIlroy testified as follows:

Q. (by Mr. Schroeder):   Based on the communications that you had with Briese in Germany, did you have an understanding before the meeting as to what sort of relationship you expected to evolve?

A. (by Ms. McIlroy):      Yes.   Before we went to New York, yes.

Q.      What was that expectation?

A. (by Ms. McIlroy):      I had an expectation.  The expectation was that Brent and I would have exclusive North American rights to rent out that equipment and to establish the Briese name in the United States.  That expectation was confirmed after I met the Brieses in New York.

Q. Your understanding prior to the meeting was based on communications that came to you from Germany?

A. (by Ms. McIlroy):      That came to the office from Germany and from the bank, yes.

Q.      You would have exclusive right to rent?

A. (by Ms. McIlroy):      Rent, sell and to represent.

Q.      Who were these communications in Germany with?

A. (by Ms. McIlroy):      With the Brieses.  Briese Lichttechnik Vertriebs.

Q.      With Mr. or Mrs. or both of them?

A. (by Ms. McIlroy):      Both.  Both of them.  The exclusivity was mostly Mr. Briese.

McIlroy Depo at 13:18 - 14:21.

At the dinner meeting in New York, the parties reached an oral agreement (McIlroy Depo at 24:7-11) whereby Briese USA would have exclusive North American rights.  See McIlroy Depo at 24:12 - 28:10.  According to Ms. McIlroy, the agreement is Briese USA would be responsible for and liable for any modifications to the equipment, Briese USA would be credited and acknowledged for any changes to the equipment, Mr. Briese would not sell or rent Briese equipment to anyone else in the United States, Briese USA would have exclusive

North American rights and that the parties did not need to memorialize this because a handshake was good enough. See McIlroy Depo at 28:18 - 29:12. Briese USA was given exclusive North American rights to rent, sell and to represent and promote the Briese name. McIlroy Depo at 31:6-10.

Ms. McIlroy further testified:

> Q.    Are there any other witnesses to this oral agreement that you reached at dinner in New York other than the people we have talked about, that would be yourself, Mr. Langton, Mr. and Mrs. Briese and this fifth person?
>
> A. (by Ms. McIlroy):    No. I'm here to just testify on what Mr. Briese promised me. And he gave me a very clear assurances that I needed at that time in my life, that if I was going to sign my name for all these loan documents and make such a big purchase, that I would have a modicum of safety, security, stability to my future, I'm here to say he gave me those assurances. **If he's saying now he didn't, he's not being truthful . . . He said a handshake was good enough. He shook Brent's hand and he shook my hand.  He made me a promise.**

McIlroy Depo at 61:17 - 62:11 (emphasis added).

Ms. McIlroy testified that she was assured that Briese USA could in fact make any changes needed to be made to the equipment:

> Q. (by Mr. Schroeder):   When you arrived at this meeting in New York, you had in your mind the contours of what you think the agreement ought to be, correct?
>
> A. (by Ms. McIlroy):  No, I had what Mr. Briese said.  I had documents -- the contours of my mind;  its like a song, Windmills of My Mind.  No, I don't operate that way.  I had loan docs.  I had faxes. I had emails.  I had phone calls.  I had conversations.  I had a whole

day at a trade show when I arrived.  It wasn't just the contours of my mind.  It was clear.  It was clear for me that we were going to be making -- we had already made a significant purchase, and that changes needed to be made to the equipment.  Mr. Briese wasn't willing to make those changes to the equipment.  I was concerned because that's a lot of money to spend on equipment that we needed to use in the United States.  **I was assured that we, could in fact, make any changes we want and still use the Briese name**.

McIlroy Depo at 62:12 - 63:6 (emphasis added).

**B.    The testimony of Mr. Langton.**  Mr. Langton is the owner and president of Briese USA, Inc.  Langton Depo at 8:5-6, Ex. 2.  Mr. Langton testified that the parties reached an oral agreement following the pdn show in New York in 1998 or 1999.  Langton Depo at 30:17-32:23.  Mr. Briese introduced Mr. Langton and Ms. McIlroy to the predecessor, Mr. Brown, as his new North American representatives.  Langton Depo at 33:21-23.

The terms of the agreement were that Mr. Langton would have to deal with the electrical problems with the equipment (Langton Depo at 35:1-14), Mr. Langton was to establish and give the name a position in the marketplace and if he did this he would reap the benefits (Langton Depo at 36:13-17) and that Mr. Langton was the North American representative and importer of the equipment.  Langton Depo at 36:17-19.

Anything that has to do with the product in America, Mr. Langton was to handle because nobody else was handling it.  Langton Depo at 38:23-25.  What this meant was that Mr. Langton had exclusive distribution rights for Briese products in the United States.  See Langton Depo at 71:22-72:10.  Mr. Langton testified that this was a handshake agreement (Langton Depo at 43:19-22) and no writing was necessary.  Langton Depo at 44:1-8.

1       **C.**    **The testimony of Mr. Ortiz.**   Mr. Ortiz is part owner of Briese USA,

2 and does research, development, repairs and co-manages the office for Briese USA.

3 Ortiz Depo at 7:16-21, Ex. 3. Mr. Ortiz frequently flew to Germany on behalf of

4 Briese USA at least one trip every two months, and sometimes twice a month, to sit

5 down and talk strategy with Mr. Briese, to talk about what was going on and to talk

6 about equipment purchases by Briese USA. Ortiz Depo at 159:9-14. Mr. Ortiz

7 testified that Mr. Briese stated: "**If you guys want to keep your exclusivity**, you

8 have to buy more equipment. I need you to buy next year -- I need you to buy more

9 equipment. I'm having problems. You have to help me out." Ortiz Depo at 159:16-

10 20 (emphasis added). Mr. Ortiz agreed to make such purchases, and Briese USA

11 did in fact end up making two or three substantial purchases of equipment to help

12 out Mr. Briese even though Briese USA did not need the equipment. Ortiz Depo at

13 160:10-15.

14

15 **III.**   **APPLICABLE LEGAL STANDARDS**

16       The purpose of preliminary injunctive relief is to preserve the *status quo*

17 pending a determination of the action on the merits. *Chalk v. U.S. Dist Ct.*, 840

18 F.2d 701, 704 (9th Cir. 1988). "The status quo *ante litem* refers not simply to any

19 situation before the filing of the lawsuit, but instead to the last uncontested status

20 which preceded the pending controversy." *GoTo.Com v. Walt Disney Co.*, 202 F.3d

21 1199, 1210 (9th Cir. 2000).

22       A party seeking preliminary injunctive relief must show either: (1) a

23 combination of probable success on the merits and the possibility of irreparable

24 injury or (2) that serious questions are raised and the balance of hardships tips

25 sharply in his favor. *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475

26 F.Supp.2d 995, 1000 (CD Cal. 2007).

27       To demonstrate a likelihood of success on the merits in a trademark action, a

28 party seeking injunctive relief must prove (1) ownership of a valid trademark and

(2) a likelihood that the allegedly infringing mark will be confused with its own mark.  See *Omega Nutrition USA v. Spectrum Marketing*, 756 F.Supp. 435, 438 (ND Cal. 1991) (preliminary injunction granted in favor of exclusive distributor).

The parties' agreement was reached in New York.  Under New York law, oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing.  *Wisdom Import Sales Co., LLC v. LaBatt Brewing Co., Ltd.*, 339 F.3d 101, 109 (2d Cir. 2003) citing *R.G. Group, Inc. v. The Horn & Hardart Co.*, 751 F.2d 69, 74-75 (2d Cir. 1984) (agreement does not lack "formality" simply because the parties may not have reduced its terms to writing).  For these and the following reasons, Plaintiff is likely to succeed on its claim:

## IV.   PLAINTIFF OWNS THE BRIESE MARK IN THE U.S.

In *Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217 (9th Cir. 1996), the Ninth Circuit held that an exclusive distributor may acquire trademark rights superior to those of a manufacturer.  The courts will look first to any agreement between the parties regarding trademark rights. 96 F.3d at 1221.  The other factors include:

(1) which party invented and first affixed the mark onto the product;

(2)  which party's name appeared with the trademark;

(3) which party maintained the quality and uniformity of the product;

(4) with which party the public identified the product and to whom purchasers made complaints;

(5) which party possesses the goodwill associated with the product, or which party the public believes stands behind the product.

96 F.3d at 1220.

Applying these factors, courts have found that an exclusive distributor had acquired superior trademark rights over the manufacturer and granted a preliminary injunction in favor of the distributor.  See *Omega Nutrition USA v. Spectrum*

*Marketing*, 756 F.Supp. 435, 438 (ND Cal. 1991); *Tactica International, Inc. v. Atlantic Horizon Int'l*, 154 F.Supp.2d 586, 599-601 (SDNY 2001).

**(A) Agreement between the parties regarding trademark rights.** This factor favors Plaintiff. Briese USA has exclusive North American rights to rent, sell and to represent and promote the Briese name. McIlroy Depo at 31:6-10. Briese USA could make any changes Briese USA wanted to the equipment and still use the Briese name. McIlroy Depo at 62:12 - 63:6. Mr. Ortiz testified that Mr. Briese admitted to him that Briese USA has exclusivity and that Briese USA has in fact purchased additional equipment when requested. Ortiz Depo at 159:16-20.

**1. Which party invented and first affixed the mark onto the product and with services.** Defendant originated the mark Briese on lighting equipment in Germany based on the surname of Defendant Mr. Hans Werner Briese.

**2. Which party's name appeared with the trademark.** This factor favors Briese USA for equipment, for equipment rental and for answering incoming customer repair calls. For the equipment, Mr. Langton testified that every piece of equipment is labeled to let people know where to bring it back to if it gets lost. Langton Depo at 241:11-21 and depo Exh. 115 (Ex. 10) showing the labels with the Briese USA New York address. Briese USA also has cow tags for equipment and other ways for labeling the equipment that have the Briese USA New York address. Langton Depo at 242:2-243:4 and depo exh. 116.

Regarding equipment rental, the rental price sheets used by Briese USA are shown in depo exh. 114 and these list the Briese USA New York and Los Angeles addresses written on them. Langton Depo at 239:17 -241:2 and Exh. 114.

Regarding services, Mr. David Malykont answers incoming calls at the Briese USA Los Angeles office. Malykont Depo at 25:12-14; 8:21-25. This includes calls from customers who have a problem with a piece of equipment. Malykont Depo at 21:17-25. Mr. Malykont answers incoming calls "Briese USA".

Malykont Depo at 25:12-16, Ex. 6.  In contrast, Defendant Briese GmbH has never had an office, a studio or any employees in the U.S.  HW Briese Depo at 17:5-16, Ex. 7.

   **3.  Which party maintained the quality and uniformity of the product and services.**  This factor supports Briese USA.  Mr. Sergio Ortiz of Briese USA maintains the quality and uniformity of the products that Briese USA rents out. Ortiz Depo at 111:13-112:1.  This is further supported by the testimony of Mr. David Devlin and Mr. James Belkin as follows:

   **Mr. David Devlin**.  Mr. Devlin is a motion picture gaffer.  Devlin Depo at 7:18-19, Ex. 5.   A gaffer is a lighting director who specifies and implements lighting designs.  Devlin Depo at 10:2-3.  Mr. Devlin works on motion pictures (Devlin Depo at 8: 18-19) and has worked free-lance in film commercial production and in music video production.  Devlin Depo at 9:1-2.  Mr. Devlin testified he has been working with Steven Spielberg primarily for the last thirteen years (Devlin Depo at 9:10-11) and worked on films including Jerry McGuire, The Lost World, Saving Private Ryan, War of the Worlds and Indiana Jones.  Devlin Depo at 9: 6-9. Mr. Devlin also works as a still photography lighting director and has since 1998. Devlin Depo at 9:13-24.

   Mr. Devlin first became aware of Briese lighting equipment in 2002 through his work with a photographer.  Devlin Depo at 12:8-12.  Mr. Devlin has always seen Briese USA as the source of Briese equipment.  Devlin Depo at p. 14:19-15:1. If Mr. Devlin needed repairs for the Briese equipment, had to rent Briese equipment in the U.S., or needed replacement parts for Briese equipment, he would go to Briese USA.  Devlin Depo at 15:2-24.

   **Mr. James Belkin**.  Mr. Belkin is a Director of Photography hired to create images for network television with some of his work created to be shown at Regal Cinemas.  Belkin Depo at 7:14-17, Ex. 4.  Mr. Belkin does promos for NBC, TNT, TBS, The Discovery Channel, The Learning Channel and The Sundance Channel.

Belkin Depo at 7:8-12.  Mr. Belkin graduated from Syracuse University in 1977, moved out to Hollywood in 1984 and was a Director of Photography by 1987. Belkin Depo at 7:19-22.

Mr. Belkin has used Briese lighting equipment and his first use was in 1999 when he was doing a big project for NBC.  Belkin Depo at 8:20 - 9:3.  Mr. Belkin has used the Briese lighting every year since 1999.  Belkin Depo at 11:12.  Mr. Belkin's understanding has been that the source of the Briese lighting was Briese USA's president, Brent Langton (Belkin Depo at 11:1-8; 14:15-20) and that Mr. Langton is Briese. Briese Lighting in New York and LA.  Belkin Depo at 14:21-23. Mr. Belkin testified that Mr. Langton maintains the quality of the product Belkin uses (Belkin Depo at 16:6-16), Mr. Langton stands behind the product Belkin acquires (Belkin Depo at 16:17-17:1) and that the service provided by Briese USA is "Remarkable.  Just absolutely remarkable . . .  Top to bottom it's the best service".  Belkin Depo at 19:13-22.

**4. With which party the public identified the product and services and to whom purchasers made complaints.**  This factor supports Briese USA based on the testimony of Mr. Devlin and Mr. Belkin.   Mr. Devlin has always seen Briese USA as the source of Briese equipment. Devlin Depo at p. 14:19-15:1.  If Mr. Devlin needed repairs for the Briese equipment, had to rent Briese equipment in the U.S., or needed replacement parts for Briese equipment, Mr. Devlin would go to Briese USA.  Devlin Depo at 15:2 to 15:24.

Mr. Belkin testified that he understood Briese USA's President Mr. Langton as the source of the Briese lighting (Belkin Depo at 11:1-8; 14:15-20) and that Mr. Langton is Briese. Briese Lighting in New York and LA.  Belkin Depo at 14:21-23 (emphasis added).  Mr. Belkin testified that Mr. Langton maintains the quality of the product Belkin uses (Belkin Depo at 16:6-16), Mr. Langton stands behind the product Belkin acquires (Belkin Depo at 16:17-17:1) and that the service provided

by Briese USA is "Remarkable.  Just absolutely remarkable . . ."  Belkin Depo at 19:13-22.

     **5.  Which party possesses the goodwill associated with the product and services, or which party the public believes stands behind the product and services.**  This factor supports Briese USA.  When someone rents Briese lighting equipment in the U.S., they contact either Dave Malykont or Brent Langton of Briese USA.  See Ortiz Depo at 112:2-5.  As Mr. Ortiz testified, "Ask any photographer who handles Briese equipment in Los Angeles and they are going to tell you immediately that it's us".  Ortiz Depo at 158:3-6.  Both Mr. Devlin and Mr. Belkin testified that they view Briese USA as the source of the Briese equipment and that Briese USA stands behind the product and services.  See Devlin Depo at 14:19-15:24;  Belkin Depo at 16:6-17:1; 19:13-19:22.  Mr. Langton received a call from Sun Studios about a broken Briese equipment head and even though Briese USA did not supply that piece of equipment, Briese USA provided Sun Studios with a replacement head.  Langton Depo at 247:19-248:19.

## V.    PLAINTIFF ESTABLISHED SECONDARY MEANING

     Secondary meaning is "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (citations omitted).  See also *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 991 (9th Cir. 2006) (secondary meaning is the consumer association of the mark with a particular source or sponsor).

     Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchasers of the product bearing the mark associate the mark with the producer, (2) the degree and manner of advertising under the mark, (3) the length and manner of use of the mark, and (4) whether use

1  of the mark has been exclusive. *Id.* citing *Committee for Idaho's High Desert v.*

2  *Yost*, 92 F.3d 814, 822 (9th Cir. 1996).

3       Here, Plaintiff has established secondary meaning based on the following

4  evidence:

5       **1.**    **Actual purchasers (Mr. Devlin and Mr. Belkin).**

6       **Mr. David Devlin**.  Mr. David Devlin, a motion picture gaffer, testified:

7       Q.    Over the time you have used Briese equipment, what have

8       you seen was the source of that equipment?

9       A. (by Mr. Devlin):  Briese USA.  Even in London when we

10      used it there, it was Briese USA.  **Previous to this deposition, I**

11      **wasn't even aware there was another source for Briese lighting.**

12 Devlin Depo at p. 14:19 - 15:1 (emphasis added).

13      If Mr. Devlin needed repairs for the Briese equipment, had to rent Briese

14 equipment in the U.S., or needed replacement parts for Briese equipment, he would

15 go to Briese USA.  Devlin Depo at 15:2 to 15:24.   Mr. Devlin also testified that if

16 he needed something done such as a new piece of lighting equipment, they (Briese

17 USA) are "a hard charging company.  Basically, whenever you need something to

18 be someplace, they make it happen . . ."  Devlin Depo at 15:2 to 15:24.

19      **Mr. James Belkin**.  Mr. Belkin, the Director of Photography, has used

20 Briese lighting equipment since 1999 when he was doing a "mondo" (a big giant

21 project) for NBC.  Belkin Depo at 8:20-9:3.  Mr. Belkin testified:

22      A. (by Mr. Belkin):  . . . so I was doing a mondo for NBC, and a

23      gaffer I knew, Ted Hayash, said "Hey, Jim, there's this new light out

24      here called a Briese light."  And I go, "Oh, yeah?" Because I'm always

25      up to see new things.  And he said, "Do you mind if I -- I have Brent

26      Langton.  He's got these lights.  Do you mind if he comes by just to

27      show you?"  So it was at Raleigh Stage 5, and when I went around the

28      corner of the set, they were all lined up and lit.  And first of all, I was

1    taken in by the shape of the shelves from behind.  It was like, "Oh, this

2    is interesting." And then I walked around in front, and it was love at

3    first sight.  And then I said, 'Stand in front of it." And the quality of the

4    light, the skin tone, it was really, really, really beautiful, and I started

5    using them then.  So I would say from 1999 until now I've been using

6    them extensively in many different fashions and forms . . .

7    Belkin Depo at 9:10 - 10:2.

8        Mr. Belkin has used the Briese lights every year since 1999.  Belkin Depo at

9    11:12.  Mr. Belkin's understanding has been that the source of the Briese lighting

10   was Brent Langton (Belkin Depo at 11:1-8; 14:15-20) and the company that Mr.

11   Langton runs is Briese. Briese Lighting in New York and LA.  Belkin Depo at

12   14:21-23.

13       **2.     Plaintiff's Advertising under the Mark.**  Briese USA extensively

14   advertised under the mark to promote Briese USA's business.  McIlroy Depo at

15   51:20.  The advertising included press releases, advertisements in photography

16   publications, trade shows in Los Angeles and New York, holding demonstrations in

17   Los Angeles and New York, free rentals of the lights to get people familiar with the

18   equipment and also rented the lights.  McIlroy Depo at 49:24 -50:10.  Mr. Langton

19   went to universities and art schools that focused on photography and did free

20   demonstrations and Briese USA did make some modifications to the lights so they

21   would work on set.  McIlroy Depo at 50:11-16.  On the night after the parties

22   reached their oral agreement, Briese USA held at party at Briese USA's New York

23   office and introduced the launching of Briese USA.  McIlroy Depo at 55:16-19;

24   71:15-72:1.

25       Mr. Ortiz also has given away promotion items with "Briese" name on them

26   and Briese USA has from day one.  Ortiz Depo at 109:22-111:9.  Currently,  Briese

27   USA's people are the advertising and Mr. Langton goes out and visits a client onset

28

13

at 5:00 till 10:00, helps them break it down, asks what happened and recommends something.  Langton Depo at 124:15-125:14.

**3. and 4.**    **Length and manner of use and whether use has been exclusive**.  Briese USA had exclusive North American rights to rent, sell and to represent and promote the Briese.  McIlroy Depo at 31:6-10.  According to Mr. Langton, that relationship did not change until the end of 2006 when Mr. Briese began to breach the parties' agreement.  See Langton Depo at 27:16-24. Mr. Ortiz testified that nobody has more full service than Briese USA.  Ortiz Depo at 121:6-9.

## VI.    DEFENDANT BRIESE GMBH FAILED TO ESTABLISH SECONDARY MEANING AS REQUIRED

In contrast, Defendant Briese GmbH failed to prove secondary meaning in the mark "Briese" or the mark "Briese USA" at any time.  The alleged senior user, here Defendant Briese GmbH, must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark.  See 2 McCarthy § 16:34, p. 16-57 to 16-60.  See also *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970) (plaintiff failed to provide secondary meaning in its mark at anytime including prior to defendant's use date).  Professor McCarthy states:

> If the senior user cannot prove that its mark possessed secondary meaning at the time defendant commenced its use, there can be no infringement, for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the scene.

2 McCarthy §16:34, p. 16-59.

Here, Defendant Briese GmbH cannot prove secondary meaning in the U.S. in 1998 or 1999 when Plaintiff began using the Briese and Briese USA marks. Defendant submitted no evidence of secondary meaning through any of its witnesses or documents.  Defendant's position is the complete antithesis of

secondary meaning in the U.S.:  Defendant Briese GmbH has never had an office, a studio or any employees in the U.S.  HW Briese Depo at 17:5-16.  Briese GmbH has never done repair work in the U.S.  J. Briese Depo at 56:21-25.  Defendant Briese GmbH has never used the term "Briese USA" in the United States.  HW Briese Depo at 17:17-19.

Ms. Lee Anne McIlroy testified that while he was aware of other lighting equipment, she did not know about Briese.  McIlroy Depo at p. 69:6-20.  Although Mr. Briese previously submitted two declarations in connection with Defendant's motion, those declarations are not competent evidence of secondary meaning because Mr. Briese testified that he has had nothing to do with sales for more than 20 years probably 22 years.  HW Briese Depo at 76:17-77:7.  Defendant cannot establish secondary meaning at any time.

## VII.  PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF CONFUSION

In *AMF v. Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir. 1979), the Ninth Circuit set forth a list of factors to be used in determining a likelihood of confusion: the similarity of the marks, strength of Plaintiff's mark, relatedness of the goods, marketing channels, evidence of actual confusion, defendant's intent, degree of consumer care and likelihood of expansion of product lines.

The *Sleekcraft* factors all support a finding in favor of Plaintiff Briese USA. The competing marks are similar.  Both marks are "Briese" and Plaintiff uses Briese USA with the dominant portion being "Briese".

Plaintiff's mark is a strong mark.  Plaintiff established secondary meaning as shown by the testimony of Mr. Dave Devlin and Mr. James Belkin.  Plaintiff's mark is strong for services.  See Belkin Depo at 19:13-22 (explaining that the service provided by Briese USA is "Remarkable.  Just absolutely remarkable . . .  Top to bottom it's the best service.").  Nobody has more full service than Briese USA. Ortiz Depo at 121:6-9.  Plaintiff extensively advertised and promoted the mark in

the U.S. as shown by the testimony of Ms. McIlroy and Mr. Langton.   Plaintiff's
revenues have increased year to year since inception and have been extraordinary or
"off the charts" for 2006 and 2007 with new clients coming on board.   See Langton
Depo at 120:24-121:18.  Exhibit 117 reflects Plaintiff's revenue growth since 1998.
See Langton Depo at 243:11-15.   These facts support a finding that Plaintiff's mark
is a strong mark.

  The goods are related.  Both are lighting equipment and related support
equipment.  Plaintiff's rental, repair, grip and other services are related to lighting
equipment.  The marketing channels are also the same, as Defendant wishes to sell
to photographers and cinematographers and Plaintiff rents and sells to
photographers and cinematographers.  Defendant Mr. Briese recently contacted a
customer of Briese USA by email.  See April 11, 2008 Langton Declaration at ¶ 2.

  The factor of Defendant's intent favors Plaintiff.  Mr. Ortiz has knowledge
that a former Briese USA employee, Doyle Leeding, took equipment and possibly
other materials without permission to meet with Mr. Briese in Germany in late
2006.  Ortiz Depo at 116:10 -118:10.   In deposition, Mr. Briese confirmed the
October 2006 meeting in Germany with Mr. Leeding, confirmed that Mr. Leeding
brought a reflector skin and a flashtube but Mr. Briese is not sure if Mr. Leeding
was still an employee of Briese USA at that time.  HW Briese Depo at 48:25-53:17.
 Mr. and Mrs. Briese even tried attempted to entice Mr. Ortiz to open his own
"Briese thing" in Los Angeles because Mr. Ortiz already knew how to service the
equipment.  Ortiz Depo at 27:19-29:13.

  The evidence of actual confusion supports Plaintiff.   Mr. Langton testified
that in early 2008, an employee of Pier 59 was confused when he called Briese
USA to come and pick up Briese equipment at Pier 59 which was later discovered
to be equipment of Defendant Drive In.  Langton Depo at 238:2-16.

  The degree of consumer care favors Plaintiff because customers are reluctant
to change to something else and stick with what they perceive as a winning

combination. Langton Depo at 78:14-20. Likelihood of expansion of product lines favors Plaintiff because as stated above, Mr. and Mrs. Briese attempted to entice Mr. Ortiz to open his own "Briese thing" in Los Angeles.

## VIII. ANALYSIS OF THE DIFFERENT TYPES OF CONDUCT AT ISSUE

In the August 7, 2007 order, the Court asked for briefing on different types of conduct engaged in by Plaintiff and whether there was a license, knowledge and/or there was acquiescence to this conduct. Each of these is discussed hereafter:

**(1) Business name Briese USA.** Defendant has known about and acquiesced to Plaintiff's use of Briese USA. Mr. Langton formed Briese USA after Mr. Briese asked him to help out on a patent infringement suit in the U.S. and Mr. Briese agreed that Mr. Langton could use that name to form a corporation. Langton Depo at 48:23-50:6. The former manager of Briese USA's New York office, Mr. Gino Zardo, visited Mr. Briese in Germany and Mr. Briese told Mr. Zardo that Brent Langton is the American representative and if he needed anything it's Briese USA, not Gino Zardo. Langton Depo at 236:5-237:2. Following the parties' dinner meeting in New York, Ms. McIlroy sponsored a party at Briese USA's New York offices with both Mr. Briese and Mrs. Briese in attendance whereby Briese USA welcomed the Brieses here. See McIlroy Depo at 71:15-72:1.

Both Mr. and Mrs. Briese introduced Mr. Ortiz and Mr. Langton as Briese USA at the Fotokina trade show in Cologne Germany in 2002/2003. Ortiz Depo at 29:14-30:16. Mr. Briese introduced Mr. Ortiz as Brent Langton's partner and as Briese USA, the guys that run Briese in America. Ortiz Depo at 33:9-16.

**(2) Modification and subsequent rental of equipment purchased from Briese GmbH.** Defendant has known about and acquiesced to these activities. Ms. McIlroy and Mr. Langton testified that necessary modifications to the equipment were part of the parties' agreement. McIlroy Depo at 25:13 - 27:16; 28:22-29:1; Langton Depo at 35:1-14. The parties discussed specific items that

17

1 | needed modification with the equipment, including the European electrical system
2 | that required the use of adapters in the U.S. and the noisy fan. McIlroy Depo at
3 | 25:19 - 26:15. These specific items were brought up with Mr. Briese (McIlroy
4 | Depo at 26:16) and the agreement was that Briese USA would be responsible for
5 | any modifications to the equipment, Briese USA would be liable for any
6 | modifications and Briese USA would be credited and acknowledged for any
7 | changes to the equipment. McIlroy Depo at 26:20 - 27:16; 28:22-29:1. Briese
8 | USA could make any changes Briese USA wanted to the equipment and still use
9 | the Briese name. McIlroy Depo at 62:12 - 63:6.

10 | Mr. Sergio Ortiz testified that Mr. Briese is aware of all repairs that Mr. Ortiz
11 | does. Ortiz Depo at 44:8-14. Mr. Ortiz repaired the original focus tube (Ortiz
12 | Depo at 75:23-16 and Ex. 38) by modifying the original focus tube with his own
13 | design. Ortiz Depo at 77:39-80:10. Mr. Ortiz then took his modified design part to
14 | Briese GmbH in Germany, first showed it to the shop and then showed it to Mr.
15 | Briese to which there was no objection. Ortiz Depo at 80:11-81:6. Mr. Briese
16 | knew that Briese USA was renting out this modified focus tube. Ortiz Depo at
17 | 81:19-21. Mr. Briese told Mr. Ortiz "I don't want to deal with it any more. You
18 | guys just do what you have to do." Ortiz Depo at 83:2-4.

19 | Mr. Ortiz also made modifications to the connectors used on the inside of the
20 | focus tube (See Ortiz Depo at 84:14-89:23 and Ex. 40) because the original parts do
21 | not work. Ortiz Depo at 90:6-9. Mr. Briese knows that Briese USA is renting out
22 | the modified parts. Ortiz Depo at 90:22-24. Mr. Ortiz showed Mr. Briese the
23 | development of the prototypes from beginning to the end. Ortiz Depo at 90:25 -
24 | 91:2. Mr. Ortiz also modified the male connectors for the Briese bitube (Ortiz
25 | Depo at 95:8-97:7 and Ex. 41) and Mr. Briese knew Briese USA was renting out
26 | these modified parts. Ortiz Depo at 97:15-19.

27
28

Moreover, under the exhaustion doctrine, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. *Sebastian Int'l v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir. 1995) As Professor McCarthy states, "[i]t would be absurd to hold that a manufacturer could sell a branded product to a distributor without restriction and then tell the distributor that it could not resell the branded goods without either paying for a trademark "license" or removing the trademark." 4 McCarthy § 25:41, p. 25-109. Thus, not only did Defendant have knowledge of and acquiesce to these activities, but the exhaustion doctrine would bar Defendant's right to control later distribution.

**(3) Use of the Briese mark in rental of equipment obtained from third parties.** Briese GmbH has known about and acquiesced to Briese USA's rental of new equipment and equipment obtained from third parties. For example, Mr. Ortiz testified that the flash tube has always been a huge problem. Ortiz Depo at 54:24-25 and Ex. 36. See also Ortiz Depo at 55:5 to 61:13. Mr. Ortiz told Mr. Briese that he was going to design his own flash tube. Ortiz Depo at 61:12-16. Mr. Ortiz brought his latest version of the flash tube to Mr. Briese's office, showed it to Mr. Briese, sat down with Mr. Briese, went over it together and Mr. Briese told Mr. Ortiz that the he thought the parts were fantastic. Ortiz Depo at 64:6-11. Mr. Briese knew Mr. Ortiz was renting this out in the U.S. because Mr. Ortiz had showed him three different incarnations throughout the span of a year. Ortiz Depo at 64:21-65:5.

Mr. Ortiz designed a new umbrella mount. Ortiz Depo at 107:2-12 and Ex. 45. Mr. Ortiz came up with this new design after the original design from Briese GmbH did not work when used in the U.S. See Ortiz Depo at 100:13-105:16. Mr. Briese has known that Briese USA is renting out this new umbrella mount in the United States. Ortiz Depo at 109:1-4. Mr. Ortiz has been making custom equipment for Spielberg and for Madonna and a hand held 330 umbrella all of which Mr. Briese is aware of. Ortiz Depo at 112:6-114:16. Mr. Briese knows that

1    Briese USA is renting out this new equipment based on the information from Mr.

2    Ortiz.  See Ortiz Depo at 114:24-115:1.

3

4    **IX.    A TRADITIONAL TRADEMARK PRIORITY ANALYSIS IS NOT**

5    **APPLICABLE IN A MANUFACTURER DISTRIBUTOR RELATIONSHIP**

6         In the Court's August 7, 2007 Order, the Court asked for further briefing as

7    to whether traditional priority analysis was appropriate in a manufacturer distributor

8    relationship.  The answer to that question is no, a traditional priority analysis is not

9    appropriate for the following reasons.

10        In a dispute over priority of use for a mark requiring secondary meaning,

11   mere priority of use as for technical trademarks is insufficient.  See 2 McCarthy §

12   16:34, p. 16-56.  It is the party who first achieved trademark significance in the

13   mark through secondary meaning who is the senior user of such a mark.  *Id.*  As

14   Professor McCarthy states:

15            For secondary meaning marks, the issue of priority and

16            ownership is not which party first used the mark, but which party first

17            achieved secondary meaning in the mark.  As the California Court of

18            Appeals stated:

19                 [T]he basic problem appears to be a determination of which

20                 title or name, regardless of its adoption in point of time, first

21                 made a sufficient impact on a substantial segment of the

22                 purchasing public that there thus arose the required association

23                 between the title or name and its single source.

24   2 McCarthy § 16:34, p. 16-57, citing *Family Record Plan, Inc. v. Mitchell*, 172

25   Cal.App.2d 235, 342 P.2d 10 (2d Dist. 1959).

26        Second, there is secondary authority suggesting that the question of priority

27   is not implicated in a manufacturer distributor relationship.  See Chestek, *Who*

28   *Owns The Mark? A Single Framework For Resolving Trademark Ownership*

*Disputes,* 96 Trademark Reporter 681, 697 (May 2006 - June 2006) ("The question of priority is simply not implicated, however, because both parties are claiming rights in the same single trademark property, either one that came into existence during the relationship or was pre-existing but then used jointly", citing *Liebowitz v. Elsevier Science Ltd.,* 927 F. Supp. 688, 695 (S.D.N.Y. 1996) and *Omega Nutrition U.S.A., Inc. v. Spectrum Mktg., Inc.,* 756 F. Supp. 435, 438 (N.D. Cal. 1991). The author goes on to state: "The author suggests that, in ownership cases, the question should not be which of two parties has earlier use, but instead recognition that the dispute is over a single mark, which could only have one first use date, leaving the court to decide only which party is more entitled to its continued use." Chestek, 96 Trademark Reporter at 697.

Here, mere priority of use for a mark such as Briese, a surname, is not controlling. As discussed above, Plaintiff was the party who first achieved trademark significance in the mark through secondary meaning and it is Plaintiff who has superior rights to the Briese mark.

## X.   THE MERGER RULE IS INAPPLICABLE AND UNNECESSARY TO THE PRESENT CASE

In the August 7, 2007 order, the Court asked for briefing on the merger rule and whether the merger rule applies in view of Plaintiff's previous argument that Plaintiff has superior rights in the mark based on alleged senior use and a later grant of exclusive rights by Mr. Briese. The merger rule does not apply for the following reasons

As stated in McCarthy, under the merger rule, if: (1) party Alpha uses the mark and later becomes a licensee of Beta under the same mark; and (2) the Alpha-Beta License ends; then (3) Alpha cannot rely upon its prior independent use as a defense against an infringement claim brought against it by Beta. Alpha's prior

trademark rights were "merged" with that of Beta and inured to the benefit of Beta. 4 McCarthy§ 25:32, p. 25-84.

The argument of Plaintiff was not directed to prior use, but to the issue of acquiring secondary meaning first. As discussed above, it is Plaintiff who "first achieved trademark significance in the mark through secondary meaning who is the senior user of the mark." See 2 McCarthy § 16:34, p. 16-56. Defendant failed to proved secondary meaning at the time and place that Plaintiff first began use of the Briese mark as required. See 2 McCarthy § 16:34, p. 16-57 to 16-60. Thus, the merger rule does not apply and Plaintiff's argument directed to Plaintiff's superior rights is subsumed under the secondary meaning analysis discussed above in Sections Four and Five.

## XI. PLAINTIFF HAS DEMONSTRATED IRREPARABLE HARM AND ANY DELAY SHOULD BE ATTRIBUTED TO DEFENDANT'S MISLEADING ASSERTIONS THAT DEFENDANT HW BRIESE"S HEALTH DID NOT ALLOW HIM TO TRAVEL BY AIR IN 2007

Plaintiff's customer goodwill and reputation are being injured currently and Defendant never disclosed that Mr. Briese in fact got special permission for air travel from the same doctor whose letter was the basis for arguing Mr. Briese could not travel to Los Angeles for cross examination. Once a plaintiff has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted. *Vision Sports, Inc. v. Melville Corporation*, 888 F.2d 609, 612 (9th Cir. 1989).

Intangible injuries such as damage to goodwill can constitute irreparable harm. See *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (irreparable harm established from violation of covenant not-to-compete where intangibles like advertising efforts and goodwill were injured). Business goodwill includes a company's reputation. *Premier*

*Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F.Supp.2d 995, 1007 (CD Cal. 2007)

citing *WMX Techs v. Miller*, 80 F.3d 1315, 1325 (9th Cir. 1996).

Here, the evidence shows that Plaintiff owns the Briese and Briese USA marks and is being irreparably harmed by Defendant's conduct.  As shown by the currently filed declaration of Mr. Brent Langton, this includes Defendant's recent email to a Briese USA customer and the recent unauthorized rental activities of Eric Larson.  See April 11, 2008 Langton Declaration at ¶¶ 2-3.

Further, Mr. Ortiz testified exclusive rights in the U.S. are important to Briese USA and that Briese USA has spent a considerable amount of money developing the Briese trademark here in America.  See Ortiz Depo at 115:10-116:6.

Mr. Ortiz testified that Mr. Eric Larson is not authorized to rent out Briese equipment in the U.S. See Ortiz Depo at121:18-122:20.  Mr. Ortiz has knowledge that a former Briese USA employee, Doyle Leeding, took equipment and possibly other materials without permission to meet with Mr. Briese in Germany in late 2006.  Ortiz Depo at 116:10 -118:10.   Mr. Briese confirmed in his deposition the October 2006 meeting in Germany with Mr. Leeding.  See HW Briese Depo at 48:25-53:17.

**A. The Misleading Assertions by Defendants of "Doctor's Orders".**

Defendant Mr. Briese did get a special permission letter from his doctor to travel by air in 2007.   Defendants never so advised the Court of this fact.  Any delays in seeking preliminary injunctive relief since July 2007 should be attributed solely to Defendants.  As the Court will recall, Defendants asserted that Mr. Briese was unable to travel by air for cross examination at the August 8, 2007 hearing due to alleged health issues.  Plaintiff did its own investigation and reported to the Court in the Joint Report filed November 13, 2007 that Mr. Briese did in fact travel by air to the Maldives in July 2007.

Now, the recent deposition of Mr. Briese revealed that the alleged inability to fly was completely unfounded.  Mr. Briese received special permission from his

doctor to fly to the Maldives in July 2007.  HW Briese Depo at 72:2-18.  This special permission letter is in writing and Mr. Briese recalls that it is a one page document.  HW Briese Depo at 72:19 - 73:7.  This special permission was from the same Dr. Kuck whose other letter was the basis for arguing Mr. Briese could not travel by air.  See HW Briese Depo at 72:13-15.  Why wasn't this other Dr. Kuck letter disclosed?  In fact, Mr. Briese was not even aware that there had been an explicit order that he appear for cross examination.  HW Briese Depo at 70:25-72:3. Defendant has not produced this one page permission letter during discovery despite Plaintiff's Request for Production No. 31 that calls for such documents.  See Schewe Decl. Ex. 8 (2/5/2008 Discovery Order) and Schewe Decl. Ex. 9 (Defendant's Responses to First Set of Requests).  Any delay from July 2007 to the present should not be counted against Plaintiff in moving for injunctive relief. Plaintiff respectfully suggests that Defendants' lack of candor, which has delayed this case for months and caused hardship and expense to Plaintiff, should further support the entry of the requested preliminary injunction.

## XII.   THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF

This factor favors Plaintiff.  Plaintiff has made a strong showing of probable success on the merits and the possibility of irreparable injury.  Plaintiff has built up its business with increasing revenues each year and has established itself in the U.S. as supported by not only the testimony of party witnesses but also by the testimony of third party witnesses Mr. Devlin and Mr. Belkin.  In contrast, Defendant Briese GmbH has never had an office, a studio or any employees in the U.S. and will suffer no hardship from the injunction.

## XIII.  THE PUBLIC INTEREST FAVORS PLAINTIFF

The public interest supports the preliminary injunction requested by Plaintiff. The public has an interest in having safe reliable equipment available as provided

by Briese USA and in not being confused over the source of the equipment that is safe and reliable.  In addition, the public has an interest in seeing that commercial agreements are honored.  See *Caterpillar, Inc. v. Jerryco Footwear*, 880 F.Supp. 578, 593 (CD Ill 1994) ("The public has an interest in seeing that parties that enter into commercial agreements honor those agreements and be held accountable when they fraudulently seek to evade judgment of the Court.").  Here, the public has an interest in seeing that Defendant honor its agreement with Briese USA.

## XIV.  BOND REQUIREMENT

Fed.R.Civ.P. 65(c) provides, in relevant part, that the amount of the bond is for the payment of costs of damages suffered by the enjoined party later found to have been wrongfully enjoined.  Plaintiff has made a strong showing of probable success on the merits and the possibility of irreparable injury and respectfully asks the Court to require only a nominal bond of $1000.

## XV.  CONCLUSION

Plaintiff's motion should be granted.  The testimony of Ms. McIlroy, Mr. Langton, Mr. Ortiz, Mr. Malykont, Mr. Devlin and Mr. Belkin and the evidence set forth herein of ongoing irreparable harm and of Defendant's misleading assertion that Defendant Mr. Briese was unable to travel by air in 2007 support the grant of the requested preliminary injunction concurrently submitted.

Respectfully submitted,

LAUSON & SCHEWE LLP

Dated:  April 14, 2008          By:

Edward C. Schewe
Robert J. Lauson
Attorneys for Plaintiff/
Counterclaim Defendant
BRIESE USA, INC.

25

# PROOF OF SERVICE

I am over the age of eighteen (18) years, employed in the County of Los Angeles, and not a party to the above-entitled action.  My business address is 1600 Rosecrans Ave 4th Floor, Manhattan Beach, CA 90266

On April 14, 2008, I served a true and correct copy of the foregoing document

addressed as follows to:

> **Robert Schroeder, Esq.**
> **A Eric Bjorgum, Esq.**
> **Sheldon Mak Rose & Anderson**
> **100 E. Corson Street**
> **Pasadena, CA 91103**
> *robert.schroder@usip.com*
> *ebjorgum@usip.com*

☐   **BY MAIL**: I am readily familiar with the Firm's practice of collecting and processing correspondence for mailing.  Under that practice, it would be deposited with the United States Postal Service on the same day with a postage thereon fully prepaid at Manhattan Beach, California, in the ordinary course of business.  I am aware that, on the motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one (1) day after the date of deposit for mailing shown on this proof of service.

☐   **BY FEDERAL EXPRESS/OVERNIGHT DELIVERY**:  I caused a copy of such document to be sent via overnight delivery to the office(s) of the addressee(s) shown above.

☐   **BY FACSIMILE**:  I caused a copy of such document to be sent via facsimile machine to the office(s) of the addressee(s) at the phone number(s) shown above.

☐   **BY PERSONAL SERVICE**

     ☐   FEDERAL COURT:  I caused such envelope to be delivered by hand to the offices of the addressee(s).

     ☐   STATE COURT:  I caused such envelope to be delivered by hand to the offices of the addressee(s).

☒   **BY E-FILING**:  Pursuant to Central District of California court order this case is designated for E- Filing.  The document will be so E-Filed and a "Notification of E-Filing" will be e-mailed by the Court to all registered attorneys.

☒   **FEDERAL**: I declare, under penalty of perjury that the foregoing is true and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on April 14, 2008, at Manhattan Beach, California.

Steve Allen